# Louisville & Nashville R. R. Co. *v.* Loyd.

## *Crossing Accident.*

(Decided April 16, 1914.   Rehearing denied May 14, 1914.
62 South. 153.)

1. *Railroads; Crossings; Duty of Traveler.*—A traveler must take precaution to prevent injury to himself before attempting to drive across or otherwise cross a railroad track at a public crossing.

2. *Same; Reciprocal Rights and Duties.*—The public and the railroads have reciprocal rights and owe to each other reciprocal duties and obligations in the use of highway crossings.

3. *Same; Crossing Accident; Contributory Negligence; Jury Question.*—Under the evidence in this case it was a question for the jury whether plaintiff was guilty of contributory negligence in not stopping a second time and looking and listening for an approaching train before driving across the track.

4. *Same.*—It was a question for the jury under the evidence in this case whether the engineer had time before reaching the crossing at which plaintiff was injured to materially decrease the speed of his train, and if he had done so, whether plaintiff would have had time to have avoided the injury.

5. *Same.*—It was a question for the jury in this case whether the fireman was negligent in assuming that plaintiff had stopped and was

waiting for the train after plaintiff had disappeared from his range of view.

6. *Same; Last Clear Chance.*—If the engineer discovered plaintiff's dangerous situation in time to have prevented the injury, and failed to do so after plaintiff had driven upon the highway crossing so as to be in danger from the approaching train, and had then attempted to extricate himself from danger, plaintiff could recover for resulting injuries under a count alleging negligence.

7. *Same; Wanton Injury.*—Under all the circumstances and facts surrounding the place and time of the injury to plaintiff, it was a question for the jury whether or not the engineer in charge of the train inflicting the injuries on plaintiff was guilty of wanton negligence.

8. *Same; Failure to Give Signal.*—A failure to give the signals required by section 5473, Code 1907, at the places specified is simple and not wanton negligence.

9. *Same; Municipal Regulations.*—An ordinance prohibiting the running of any locomotive at a greater rate of speed than eight miles per hour "between 1st and 7th streets" did not include the territory occupied by 1st and 7th streets, but only the territory between them.

10. *Same; Ordinance; Omission.*—Under a count charging wanton negligence in an action for injuries at a street crossing by being struck by a locomotive, an ordinance requiring the bell to be rung when crossing the street was admissible.

11. *Same; Reasonableness.*—An ordinance prohibiting the running of a train at a greater rate of speed than eight miles per hour between certain streets, and requiring the giving of the usual signals by ringing the bell and blowing the whistle is reasonable and enforceable.

12. *Same; Instructions.*—Where the action was for injuries by being struck by a locomotive at a highway crossing, and there was in evidence an ordinance prohibiting an engine to be run at a greater rate of speed than eight miles per hour between certain streets, and requiring the giving of the usual signals, etc., a charge asserting that the ordinance only affected a part of the territory covered by 1st and 7th Streets between the outside limits of both of those streets, did not constitute affirmative error in its giving, as the ordinance applied to the whole town, except in that part relating to speed, though not including the two streets themselves with respect to the speed limit.

13. *Same.*—Where, under the evidence it was a question for the jury, as to whether the fireman was negligent in assuming that plaintiff, when he disappeared behind certain obstructions, had stopped and was waiting for the train to pass, it was not error to refuse a charge asserting that if the fireman saw plaintiff when the engine was 100 or more feet up the track, and plaintiff's wagon was 30 or 40 feet from the main track, the trainmen were not thereby bound to try to stop the train or prevent the injury.

14. *Trial; Reception of Evidence; General Objection.*—A general objection to the whole evidence, a part of which is admissible, is not good, and the court will not be put in error for overruling it.

[Louisville & Nashville R. R. Co. v. Loyd.]

15. *Same; Province of Court and Jury; Disputed Facts.*—It is the province and duty of the jury, and not of the court, to determine disputed issues of fact.

(Mayfield, J., dissents, and Anderson, C. J., and Sayre, J., dissent in part.)

APPEAL from Cullman Circuit Court.

Heard before Hon. D. W. SPEAKE.

Action by E. D. Loyd against the Louisville & Nashville Railroad Company and others. From a judgment for plaintiff, defendants appeal. Affirmed.

The following is charge 2: "The court charges the jury that, if they believe from the evidence that the fireman on defendant's engine on said occasion did see said plaintiff in his wagon when the engine was some 100 feet or more up the track, and the plaintiff and his wagon was 30 or 40 feet from the main track, then these facts did not place any duty on defendant to take any preventive efforts to stop said train or to prevent said alleged injury."

GEORGE H. PARKER, and EYSTER & EYSTER, for appellant. Charge 2 should have been given.—*B. R. & E. Co. v. Bowers,* 110 Ala. 331; *Burson v. L. & N.,* 116 Ala. 198; *L. & N. v. Black,* 89 Ala. 313; *Frazer's Case,* 81 Ala. 185. Charge 6 should have been given.—*Weatherly v. N. C. & St. L. Ry.,* 166 Ala. 675. Charges 12, 14 and 22 should have been given.—*Weatherly's Case, supra; Ga. Pac. v. Lee,* 92 Ala. 262; *Merrill v. Sheffield Co.,* 169 Ala. 242; *Anniston E. & G. Co. v. Rosen,* 159 Ala. 195; *Smith v. C. of Ga.,* 165 Ala. 410. Charge 20 should have been given.—*Weatherly's Case, supra; So. Ry. v. Arnold,* 114 Ala. 183; *McAdory v. L. & N.,* 109 Ala. 696. The duty to stop, look and listen must be performed at such a time and place with reference to the particular situation as will enable the carrier to accomplish the purpose of the law and conserve his own safety.—*C. of*

*Ga. v. Foshee,* 125 Ala. 213; *Whaley v. L. & N.,* in MSS.; 211 Fed. 331. Mere error of judgment or omission to act cannot rise to a degree of wanton negligence or willful wrong.—*H. A. & B. v. Swope,* 115 Ala. 306; *Same v. Simpson,* 91 Ala. 560; *A. G. S. v. Burgess,* 114 Ala. 587, and authorities first cited.

J. B. Brown and A. A. Griffith, for appellee. It was a question for the jury under the evidence in this case whether the engineer and the fireman were guilty of wanton negligence.—*B. R. L. & P. Co. v. Landrum,* 152 Ala. 192; *Duncan v. St. L. & S. F.,* 152 Ala. 126; *Johnson v. B. R. L. & P.,* 149 Ala. 529; *A. G. S. v. Guest,* 144 Ala. 379; *L. & N. v. Orr,* 121 Ala. 491; *L. & N. v. Davener,* 162 Ala. 660; *C. of Ga. v. Partridge,* 136 Ala. 587. It is settled beyond controversy that a recovery may be had for subsequent, and well as primary negligence under a count charging simple negligence averred in general terms.—*L. & N. v. Calvert,* 172 Ala. 597; *A. G. S. v. McWhorter,* 156 Ala. 281; *C. of Ga. v. Foshee,* 125 Ala. 199. Under the evidence in this case it was a question for the jury whether such subsequent negligence of the engineer was the proximate cause of the injury.—*L. & N. v. Calvert, supra; B. R. L. & P. v. Hayes,* 153 Ala. 190; *Sholz v. Sloss-Sheffield,* 138 Ala. 339. On the question of contributory negligence counsel cite *So. Ry. v. Shelton,* 136 Ala. 191; *K. C. M. & B. v. Weeks,* 135 Ala. 620; *L. & N. v. Bryant,* 141 Ala. 292; *Ga. Pac. v. Lee, supra; C. of Ga. v. Hyatt,* 151 Ala. 363; *B. R. L. & P. v. Hayes, supra.* As a defense to subsequent negligence, it is essential that plaintiff should be guilty of negligence after discovering his peril.—*Johnson v. B. R. L. & P., supra; C. of Ga. v. Blackmon,* 169 Ala. 304; *A. G. S. v. McWhorter, supra.* On these authorities, counsel insist that there was no error in the

rulings on the evidence or in the charges given or refused.

DE GRAFFENRIED, J.—The plaintiff, E. D. Loyd, while attempting to cross the main track of the Louisville & Nashville Railroad, where it crosses one of the avenues of the town of Cullman, was struck by a passing train of the defendant, and this suit was brought to recover compensation for the damages which he suffered thereby. The plaintiff was in a wagon which was drawn by one horse. The roadbed of the defendant at the point of the injury runs north and south, and, at that point, there were three tracks, two side tracks and a main track. The main track is in the middle of the roadbed and has one side track on the east side of it and one on the west side of it. The plaintiff was injured by a south-bound passenger train which was coming into Cullman from the north and which struck the plaintiff's wagon at a point about 600 feet north of the passenger station.

The evidence of the plaintiff tended to show that the avenue on which he received his injuries was one of the principal thoroughfares of Cullman, which is a town of 2,100 inhabitants, and that from 100 to 300 people crossed the avenue daily at the point where the plaintiff was struck, and that this situation had prevailed at that point the previous five years. The evidence of the plaintiff further tended to show that the plaintiff, when he reached a point about 30 or 40 feet from the western side tracks of the defendant, stopped and looked and listened for trains, and that he neither saw nor heard the train. His evidence further tended to show that some box cars were standing on the western side track immediately north of the point of the public crossing, and that these box cars, together with some stock chutes

which were north of the box cars, prevented him from seeing the train as it approached from the north. His evidence further tended to show that, having stopped, looked, and listened, as above stated, he started across the defendant's track; that when he, sitting in the wagon, passed the box cars on the side track, he immediately looked north and saw the approaching train; that the space between the side track and the main line was about nine feet in width; that, when he saw the train, the head and probably the fore feet of the horse were on the main line; that he immediately attempted to turn the horse around, and in doing so threw the hind wheels of the wagon on to or very close to the main track; that the locomotive struck the hind wheels of the wagon, demolished it, and threw the plaintiff to the ground, seriously injuring him.

The plaintiff, and some of the witnesses for the plaintiff, testified that neither the bell nor the whistle of the locomotive was sounded before the plaintiff's injury, or that, if the bell rang or if the whistle was blown, they did not hear it; while some of the other witnesses for the plaintiff testified that several distinct blasts of the whistle of the locomotive were given before the plaintiff was struck. The plaintiff's witnesses also differed in their estimates as to the distance the locomotive was, from the defendant, when his horse first appeared on the main line of the defendant. Some of them placed the distance at 600 feet. The plaintiff was of the opinion that the distance was 450 feet. All the testimony shows, however, that the plaintiff received his injuries almost immediately after the horse reached the main track. A witness for the plaintiff thus describes the incident: "As the engine of No. 1 was approaching me, I turned around, and as the engine passed me I turned to keep the dust from flying in my eyes when it came

against me, and I looked south down the track. When
I turned around I saw a horse entering the track at
the next crossing from me. When I looked down there,
the horse's head was about in the center of the main
line, and he just turned around in the act of going back
the way he came. He was hitched to a delivery wagon.
When I saw him he was turning south from me, turn-
ing from the train back into direction from which he
came. I watched the train until it got down to that
crossing. It was just momentary until it was there. It
hit the hind end of the delivery wagon. The horse had
turned and exposed the back end of the delivery wagon,
and the pilot picked it up. It went up in the air. I
saw a man on the wagon." The evidence for the plain-
tiff further tended to show that, at the time he received
his injuries, the train was traveling at the rate of 30 or
35 miles per hour.

The evidence of the defendant tended to show that
there was a street or road which ran parallel with the
railroad and about 200 feet therefrom, and that the
plaintiff, who had sitting by him an acquaintance by the
name of Robertson, drove the horse in a slow trot down
this road until he reached First avenue, when he turn-
ed into the avenue, and, without stopping to look or lis-
ten, drove onto the railroad track and, before he could
get off it, was struck by the train. On that subject the
witness Robertson testified as follows: "We went down
the street until we got to the Adkins crossing and turn-
ed to the left to cross the railroad. I never have learned
the street we went down onto Adkins crossing; it is the
street that goes by Steifelmeyer's. It is a street that
runs parallel to the railroad on the east side of it. The
street looks to be just reflecting over the main line; it
looks to be nearly a hundred yards or a couple of hun-
dred feet, or something like that. I think we traveled

two blocks along that street parallel with the railroad until we got to the Adkins crossing. I don't know what the distance is, not measuring or knowing anything about how wide the streets and the blocks are. There were two blocks and two streets when I got to this other street that runs at right angles to the street I was traveling on, what is called Adkins crossing, and that is the crossing where Mr. Loyd was hurt. When we got there, we turned down that street to the left, and started in the direction of the railroad. Mr. Loyd was doing the driving at that time. The horse was going in a slow trot at that time. After we turned off that street that runs parallel with the railroad and traveled across Adkins crossing, we never came to a stop that I remember anything of. We turned to the left down that little slant in a little slow trot, as we were from the store on, we continued on and approached the railroad, and I was looking down towards the depot, and in a moment Mr. Loyd said, 'Look yonder!' and then I threw my head around and spied the train, and I jumped out of the wagon. That was the only time that I remember of the horse coming to a standstill. At the time the horse came to a stop the head of the horse was across the first rail of the main line; he had crossed the east rail. The best I can recollect, when we turned off the street that runs parallel with the railroad into the street that runs at right angles, or the Adkins crossing, we could not see a train, if we had stopped and looked for some obstacles that were in the way, lumber or cars or something, until we were pretty close to the track at that time. When we got close to the track, we could have seen it some little distance. The horse would have to get on the track before we could see a train, the best I remember. I did not see the train but a minute, and I sailed out on the other side. It seems that just as I

looked at the train it made two little blows of the whistle. I do not know how close the train was to me at that time; it looked to me like it was right on us; it seemed to me after viewing .the grounds everywhere like the train was about 150 or 200 feet from us probably. I have no idea at what speed the train was going, but we were going in a slow trot; wasn't no fast traveling; I reckon we were making about four miles an hour when we came to a standstill."

The evidence for the defendant further tended to show that, at the time referred to, the train was running at about 15 to 17 miles per hour; that all proper blasts from the locomotive signaling the approach of the train had been given; that the bell was being rung; and that the horse and wagon appeared so suddenly and unexpectedly upon the track, and in such close proximity to the train, that the servants of defendant in charge of the train, by the use of all modern appliances, could not have prevented the injury. The evidence of the defendant further tended to show that the train, at the time of the injury, was properly equipped and properly handled, and was not being run at a rate of speed greater than was usual and customary at that point, viz., about 15 to 17 miles per hour. The engineer of the defendant testified that, when the horse first appeared, the locomotive was so close upon him that he could do nothing to avoid the injury and that he did not attempt to check the speed of the train for lack of time. The fireman testified that he saw the plaintiff's wagon "approching when it was about 40 feet from the track and the horse was in a trot, going right in the direction of the track. I did not do anything then but ring the bell. I just sat there and rang the bell. This horse and wagon trotted in behind some obstructions from me, cars and lumber and stuff that was piled there, and trotted out

on the track in front of the engine. Not until then did I open my mouth to tell the engineer anything about it. After the accident was the first time I said anything to the engineer on the other side, who had hold of and controlling this engine, about this man approaching the track. I told him after the accident."

All of the evidence showed that the injury occurred about 7 o'clock a. m., on a bright day in June. The evidence further showed that the plaintiff was acquainted with the schedule of the train in question and that the train was probably ten minutes late that morning.

1. There were two counts to the complaint. In the first count, the plaintiff alleged that his injuries were due to the negligence, and, in the second count, to the wantonness of the servants of the defendant, who, at the time of the injury, were in charge of the locomotive which caused his injuries. Both counts were sufficient and were not subject to the defendant's demurrer.

2. The defendant pleaded the general issue to both counts of the complaint, and four special pleas, viz., the second, third, fourth, and fifth pleas, to the first count of the complaint.

3. In plea 2, which set up contributory negligence, the defendant assumed a burden which the law did not require of it, viz., that the train was "open to ordinary observation" when the plaintiff drove his wagon into a place of danger. Before a person attempts to drive a vehicle across a railway track at a public road crossing, he must take precautionary steps to see that in so doing he will not likely receive an injury. The trial judge, on this subject, well stated the law as applicable to the evidence in this case, to the jury as follows: "As I have said, it was not only the duty of the plaintiff to stop, look, and listen, but it was his duty, gentlemen, to keep this up. It would not be a compliance with the

law if at some ill-advised place, or at some place where he could not probably hear an approaching train, to stop and to look and to listen, and then not to repeat this precaution again. It was his duty to make this a continuous act on his part until he got to that point where he was reasonably satisfied, as an ordinarily prudent man would have been, that there was no danger of an approaching train. He must not only stop, but he must listen and look; he must not only listen, but he must stop and look; he must not only look, but he must stop and listen."

The plaintiff, as already stated, claimed that he stopped and looked and listened for the train when he was about 30 feet from the track. He knew when he drove on the track that it was then about "train time," as he testified that he knew the schedule of this train. It was therefore plainly for the jury to say, if the plaintiff did stop and look and listen, as he claims to have done, whether he was not guilty of contributory negligence in not again stopping and looking, and—if he could not see the train because of obstructions—listening for the train then due, before allowing his horse to go upon the track.

The rules of law governing those who are in control of locomotives, with reference to the manner in which they shall operate and control such locomotives when approaching public crossings and in passing through densely populated portions of cities and towns, and the rules of law governing individuals who use such crossings and who go upon the tracks of railroads at such places, are not only rules of liability, but are rules in the interest of human life, and railroad companies and individuals are equally bound to observe those laws. Every member of the public and railroads have mutual rights and owe to each other mutual obligations in the

use of public crossings.—*Memphis & Charleston Railroad Co. v. Martin, Adm'r,* 117 Ala. 367, 23 South. 231; *Weatherly v. Nashville, C. & St. L. Railway,* 166 Ala. 575, 51 South. 959; *Bason v. Alabama Great Southern Railroad Co.,* 179 Ala. 299, 60 South. 922.

4. There was evidence on the part of the plaintiff tending to show that, when the plaintiff's horse appeared upon the track, the locomotive was from 300 feet to 600 feet from First avenue. The evidence on the part of the defendant tended to rebut this evidence on the part of the plaintiff, and this question of distance was therefore one for the jury. There was evidence tending to show that the engineer, after he discovered the plaintiff's peril, did nothing to stop the speed of the train. The evidence of the plaintiff tended to show that, so soon as he discovered his peril, he attempted to extricate himself by turning his horse around and getting away from the track; that he had reversed his wagon and was in the act of getting into a place of safety when the hind wheels of the wagon were struck by the passing locomotive. The theory of the plaintiff is that while the engineer, when the horse first came in sight of the engine, might not have had time, by quick action, to completely stop the engine before reaching the avenue where the injury occurred, nevertheless he did have time within which to materially diminish the speed of his train before reaching First avenue, and that, if he had done so, the plaintiff would have had time to get away from the point of danger.

We are of the opinion that this phase of the case also presented a question of fact for the determination of the jury. If the plaintiff negligently drove upon the track without looking and listening as required by the law, and by this act of negligence found himself in a place of danger, and then undertook to extricate himself—

and all the evidence tends to show that the plaintiff did, upon the discovery of his peril, attempt to extricate himself—and if the engineer of the defendant discovered this situation of the plaintiff in time, by the prompt use of proper appliances, to prevent the injury, and failed to do so, then the plaintiff was entitled to recover under the first count of the complaint.—*L. & N. R. R. Co. v. Calvert, Adm'r,* 172 Ala. 597, 55 South. 812.

"If a person voluntarily places himself in an obviously dangerous position on a railroad track, or so near thereto as to be struck by passing trains,  *  *  * but if, after discovering his peril, the result of his contributory negligence, he attempts to avoid the injury, and the railroad company is thereafter guilty of any negligence, simple or wanton, which proximately contributes to his injury, the railroad company is liable."—*Weatherly v. Nashville, C. & St. L. Railway, supra.*

5. There was, as we have already said, evidence on the part of the fireman that he saw the plaintiff when 30 or 40 feet from the track, driving the wagon in a slow trot in the direction of the track; that the wagon disappeared from view, and then suddenly reappeared. The fireman testified that he was then ringing his bell and that he did not notify the engineer of the fact that he saw the plaintiff until after the injury. It was, under all the evidence, for the jury to say whether, if the fireman saw the palintiff as he claims to have done, he had the right to presume that the plaintiff had also seen the train, and that, when the plaintiff disappeared from the fireman's view—if that was a fact—then whether the fireman did not have the right to presume that the plaintiff had stopped and was waiting for the train to pass. In other words, it was for the jury to say, under all the evidence, whether the failure of the fireman to notify the engineer of the plaintiff's presence was or was not an act of negligence on the part of the fireman.

6. If it was true, as claimed by the plaintiff, that the point at which he was struck was an unguarded crossing over one of the principal avenues in a populous district of the town of Cullman; that from 200 to 300 people were accustomed to cross there daily; that the western side track had so many box cars stored upon it as to obstruct the view of those who desired to cross that avenue at the named point from the western side to the eastern side of the avenue; that, without signaling his approach by blowing the whistle or ringing the bell, the engineer ran his locomotive across that point at a rate of speed of from 30 to 35 miles an hour—then, if the engineer knew of the conditions and above-mentioned surroundings of said crossing, the question as to whether, in this case, the engineer, on the named occasion, was guilty of that degree of reckless indifference to consequences as amounted to an act of wantonness was a question for the jury.

"To run a train at a high rate of speed and without signals of approach at a point where the trainmen have reason to believe there are persons in exposed positions on the track, as over an unguarded crossing in a populous district of a city, or where the public are wont to pass on the track with such frequency and in such numbers, facts known to those in charge of the train, as that they will be held to a knowledge of the probable consequence of maintaining great speed without warning, so as to impute to them reckless indifference in respect thereto, would render their employer liable for injuries resulting therefrom notwithstanding there was negligence on the part of those injured, and no fault on the part of the servants after seeing the danger."—*Weatherly v. Nashville, C. & St. L. Railway, supra.*

In the instant case the engineer testified to the facts from which the jury were authorized to infer that the

engineer in charge of the locomotive knew of all the surroundings at the point of the injury.

(6) Section 5473 of the Code of 1907 provides, among other things, that an engineer or other person in control of a locomotive on any railroad must blow the whistle or ring the bell at least one-fourth of a mile before reaching any public road crossing or any regular station or stopping place and continue to blow the whistle or ring the bell, at short intervals until such crossing has been passed or station reached. It also provides that he must blow the whistle or ring the bell, at short intervals, on entering into, or while moving within or passing through any village, town, or city.

This court has held that a negligent failure of the engineer to observe the above statutory requirements is an act of simple, but not of wanton, negligence.—*Central of Georgia Railway Co. v. Freeman,* 134 Ala. 354, 32 South. 778.

The town of Cullman, at the time of the plaintiff's injuries, had in operation the following ordinance: "Section 191. Any person who causes, permits or suffers locomotive engine to run at a greater rate of speed than eight miles an hour, when running forward, and four miles per hour, when running backward, between First street and Seventh street in said town, or who causes, permits or suffers any locomotive, engine or train to run or move in the nighttime without having a headlight, or who shall suffer any locomotive or train to run at any time without causing the usual signals to be given continuously by ringing the bell, must on conviction be fined not less than five nor more than fifty dollars."

In so far as the speed of a train is concerned, the above ordinance has no operation beyond the limits embraced within the description "between First street and

Seventh street in said town." The description does not embrace the territory occupied by "First" and "Seventh" streets, but only the territory between those streets. "The word 'between' has different meanings, according to the use to which it is applied. In measuring streets it excludes the objects which bound it. Webster describes it as 'the immediate space intervening, without regard to distance,' and gives as an instance the phrase 'New York is between Boston and Philadelphia'; also, 'Pennsylvania is between New Jersey and Ohio,' and 'the Delaware river is between Pennsylvania and New Jersey, but neither is a part of the other.' A street railway company, authorized by its charter to lay its track on two streets, with a right to lay a connecting track on any street between two intersecting streets which are known as the termini of its tracks, does not thereby acquire a right to lay a connecting track on either of the intersecting streets known as the termini. The word 'between' excludes the termini.— *Philadelphia v. Citizens' Pass. Ry. Co.,* 10 Pa. Co. Ct. R., 16, 20." 1 Words & Phrases, p. 768.

In so far as the above-quoted ordinance provides a penalty, however, for one who suffers "a locomotive or train to run at any time without causing the usual signals to be given continuously by ringing the bell," the ordinance covers the entire town of Cullman.

We are inclined to think that the plaintiff, when he introduced the ordinance, did so with the idea that every provision in the ordinance applied to First avenue. He introduced it as a whole, and the only objection which the defendant interposed to its introduction was that "the accident happened on First avenue and the ordinance offered applies only between First and Seventh avenues." This objection, going to the introduction of the ordinance as a whole, was not well

taken. The ordinance applies to all the territory embraced in the corporate limits of the town of Cullman, and, while not set up in the count charging simple negligence and therefore admissible for no purpose under that count, it was, in so far as it related to "ringing the bell," admissible as evidence in support of the count charging wantonness.—*Yarbrough v. Carter,* 179 Ala. 356, 60 South. 833.

While one of the provisions of the ordinance—the provision relating to the speed of trains—applies only to a limited portion of the town, it is a familiar proposition that, when a general objection is taken to the introduction of evidence as a whole, a part of which is admissible, the objection falls. The entire ordinance was not subject to the particular objection which the defendant interposed to its introduction, and the trial court cannot be put in error for admitting it.

7. That part of the ordinance which related to the speed of the train had, as we have already said, nothing to do with the speed of the train until after it had crossed First avenue, the point where the plaintiff received his injuries. The trial court, in his charge to the jury, indicated that the entire ordinance covered the space occupied by First avenue. This portion of the charge of the court to the jury is not so presented to us that we can review it.

We find, among other exceptions which the defendant reserved to the oral charge of the court, the following which we quote from the record: "At the conclusion of the oral charge of the court, the defendants then and there, in open court, and in the presence of the jury and before it retired, excepted to the following part of the oral charge of the court, 'Outside limits of both of those streets.'"

It appears from the record that, after the trial court

had concluded its oral charge to the jury, the court made to the jury the following statement: "Gentlemen of the jury, I charged you with reference to the ordinance in this town. At the suggestion of the attorneys, it is possible that the corporate limits of the city may extend beyond First and Seventh streets. Whether it does or not, this ordinance only affects the portion of the territory covered by First and Seventh streets between the outside limits of both of those streets going north and south."

We presume that the expression, "outside limits of both of those streets," excepted to as above stated, referred to that expression which appears in the above quoted excerpt.

In one aspect of this case the above-quoted excerpt was more favorable to the defendant than it should have been. The ordinance—except that part of it which relates to the speed of trains—applies to the whole of the town of Cullman. In so far as the speed of the trains is concerned, the ordinance covers the territory between First and Seventh avenues, and not the avenues themselves. As the ordinance—except as to one of its provisions—covers the whole town of Cullman, it cannot be truthfully affirmed that the court misstated the law in the above-quoted excerpt from the oral charge, and the trial court cannot be put in error on that account. For this identical reason, the court cannot be put in error for refusing to give to the jury the following written charge which the defendant in writing requested it to give to the jury: "I charge you, gentlemen, that the municipal ordinance introduced in evidence has no bearing on the facts of this case." If the defendant had requested the trial court to charge the jury that so much of the ordinance as related to the speed of trains had no bearing upon the facts of the case, a different question would have been presented by the exception.

It must be remembered that the provision in the ordinance requiring, under a penalty, that moving locomotives should, while in the town of Cullman, give the usual signals by "continuously ringing the bell," was not without its importance in this case, on the subject of wantonness. Our statutes—section 5473 of the Code —does not require the bell or the whistle, at the places named in the statute, to be "continuously" rung or blown, but only "at short intervals." The ordinance requires the bell to be "continuously rung" by a locomotive while in the town of Cullman. We see nothing in the ordinance which is unreasonable, nor why it should not be enforced. In the instant case it was the high rate of speed coupled with the absence of signals of approach which constituted the claimed wantonness on the part of the engineer.

The ordinance was admissible for the purpose indicated. If the trial court had, in an appropriate way been called upon by the defendant to limit the ordinance to the purpose indicated and had refused to do so, or if, by an appropriate exception, that part of the oral charge of the trial court which permitted the jury to consider the ordinance in conection with the rate of speed of the locomotive at the place of the injury had been brought before us, we could then, appropriately, consider whether, under all the circumstances surrounding this case, a reversible error was, as to this matter, committed on the trial.

8. All of the members of this court have devoted to this case much time and given to it much consideration. There was some evidence in the case from which the jury had the right to infer that on the named occasion the plaintiff suffered from what, in law, amounted to wantonness on the part of the defendant's servants, and there was some evidence in the case which challenged

the truth of the issues presented by each of defendant's pleas. When there are disputed issues of fact, it becomes the duty of the jury to ascertain the truth and, having done that, to settle the issues in dispute.

We find no reason why, upon the assignments of error presented by this record, the judgment of the circuit court should be disturbed. The judgment of the court below is affirmed.

Affirmed. All the Justices concur, except MAYFIELD, J., who dissents.

### ON APPLICATION FOR REHEARING.

In this case Mr. Justice MAYFIELD is of the opinion that there was no evidence from which the jury had a right to infer wantonness on the part of the servants or agents of the defendant. He is also of the opinion that the injury of the plaintiff was due to his own negligence and that the evidence all shows that, after the agents or servants of the defendant discovered the plaintiff's peril, it was too late for them to do anything to prevent the injury. He is therefore of the opinion that the defendant was entitled to affirmative instructions in its behalf as to both counts of the complaint.

2. On reconsideration of the case, ANDERSON, C. J., and SAYRE, J., are of the opinion that the refusal of defendant's requested charge 2 was reversible error under the authority of *Bason v. A. G. S. R. R. Co.*, 179 Ala. 299, 60 South. 922.

3. MCCLELLAN, SOMERVILLE, DE GRAFFENRIED, and GARDNER, JJ., are of the opinion that the trial court should not be put in error by this court for refusing to give said charge 2 to the jury. All of the evidence for the defendant tended to show that, at no time, did the plaintiff stop, look, or listen for the approach of the

train. On the contrary, the evidence of the defendant tended to show that from the time the plaintiff drove into the avenue upon which the injury occurred, until his horse was upon the main line of the defendant, the plaintiff traveled in a trot in the direction of the track and in disregard of the approach of the train. On that subject the fireman said: "I saw this wagon approaching when it was about 40 feet from the track (in another place he says 30 or 40 feet from the track), and the horse was in a trot, going right in the direction of the track. I did not do anything then but ring the bell. I just sat there and rang the bell. This horse and wagon trotted in behind some obstructions from me, cars and lumber and stuff that was piled there, and trotted out on the track in front of the engine. Not until then did I open my mouth to tell the engineer anything about it. The evidence shows that the "cars and lumber and stuff" which the plaintiff "trotted in behind" were cars and lumber and stuff on a side track of the defendant, parallel with the main line, and according to the evidence only a few feet from the main line. If the fireman had given the engineer notice of the approach "in a trot" of the plaintiff to the crossing, a blast of the whistle might have called the plaintiff's attention to the approaching train, and as all of the evidence, both for the plaintiff and the defendant, showed that the plaintiff was not aware of the train's approach until the horse was on the track, such a blast might have prevented the injury. They think that there was some evidence from which the jury had the right to infer that the fact that the plaintiff was about to attempt to cross the track of the defendant in ignorance or in disregard of the approach of the train, was open to the observation of the fireman, and that therefore the case of *Bason v. A. G. S. R. R. Co., supra,* does not apply to the facts

of this case. In other words, McCLELLAN, SOMERVILLE, DE GRAFFENRIED, and GARDNER, JJ., are not able to affirm, as matter of law, that, under all of the facts of this case, the fireman had the right to assume that the plaintiff had stopped when he disappeared behind the "box cars and lumber and stuff" on the side track. They think that, under all the evidence in this case, the question as to whether the fireman had the right to so assume was a question of fact for the jury and not a question of law for the court.