(127 So. 835)

## CENTRAL OF GEORGIA RY. CO. v. POPE.

4 Div. 433.

Supreme Court of Alabama.

April 17, 1930.

G. L. Comer and McDowell & McDowell, all of Eufaula, for appellant.

L. M. Moseley and T. S. Frazer, both of Union Springs, for appellee.

**BROWN, J.**

The plaintiff, appellee here, while engaged in driving his automobile across the defendant's railroad tracks in the town of Midway, at a private crossing, said automobile was run upon by one of defendant's locomotives attached to and pulling a freight train, in consequence of which plaintiff received injuries to his person, which some of the evidence tends to show were of a permanent nature. For these injuries he has sued and recovered a judgment for $5,000.

The first count of the complaint ascribes plaintiff's injuries to the negligence of the defendant, and the other counts ascribe said injuries to the willful or wanton conduct of the agent, servant, or employee of the defendant in charge or control of said engine, while acting within the scope of his employment.

In addition to the plea of the general issue—not guilty—to all of the counts, the defendant filed two special pleas of contributory negligence as to the first count. The second plea avers "That the plaintiff was guilty of contributory negligence in receiving the injuries now sued for, in this—that the plaintiff approached said crossing over defendant's railroad and got sufficiently near to and in close proximity to said railroad *where he could have a clear view up and along said railroad*, he failed to stop and look and listen to find out and ascertain if any train was approaching or liable to pass over and along said railroad which he was then about to undertake to cross, and that such negligence on his part proximately contributed to the injuries received by him and now sued for in this action." (Italics supplied.)

148

Plea 3 avers that plaintiff was guilty of negligence which proximately contributed to his injury in "That when plaintiff approached said crossing at which the injury occurred and got sufficiently to and in close proximity to said crossing on said railroad, *where he could have a clear view up and along said railroad*, he failed to stop and look and listen to find out and ascertain if any train of defendant was approaching or liable to pass (over) and along said crossing, which plaintiff was then about the (to) undertake to cross, and if plaintiff had so stopped and looked and listened he could and would have *seen* and heard the approaching train which struck the automobile, which could be easily seen and observed or heard, and that plaintiff's failure to stop and look and listen at such *time and place* proximately contributed to the injuries he now sues for." (Italics supplied.)

The evidence is without dispute that the crossing at which the collision between the defendant's locomotive and plaintiff's automobile occurred was situated within the corporate limits of the town of Midway, a town of about 1,000 inhabitants; that the crossing was constructed and maintained under a written contract or lease between the defendant and the Caples Lumber Company, granting the lumber company, as the defendant's tenant, for and in consideration of the payment of $1 per annum as rent, to construct and maintain said crossing in a safe condition, "in accordance with law, * * * under the supervision and in accordance with the direction of a representative of the railroad," the railroad company reserving the right "for any reason and at any time on thirty days' notice to the tenant" to require the lumber company to "remove said private road entirely from the railroad's right of way or property."

It was further stipulated that the tenant would indemnify the railroad against all losses, damages, liabilities, or expenses arising from injury or damages to all persons or property, when said injury or damage occurs at or on said private road, or as a direct or indirect result of the use thereof, and this notwithstanding any negligence, contributory negligence or otherwise," etc. Said agreement was entered into on June 18, 1924, and the evidence shows that the crossing was put in shortly thereafter by the defendant's servant, the lumber company, paying the cost thereof.

The evidence shows that there was a public road or public street on each side of the railroad tracks, leading into the business district of Midway; that a private or settled road led from one into the other, passing over the crossing where the collision with plaintiff's automobile occurred; that this private or settled road and crossing were used by the mill company's employees, and such of the public as had business with the mill company, and by others as suited their convenience or pleasure.

Mr. Abrams, one of defendant's witnesses, testified as to the character of the neighborhood where the crossing is located, and its location: "The railroad company put in that crossing at the instance of the J. D. Caples Lumber Company. There was no road crossing there before it was put in. I guess we (the Caples Lumber Company) opened up that road. My best judgment is that it is about 200 yards within the corporate limits of Midway or James. There are many people living around that planing mill, or right near it, back of it, I suppose, and at the side of it. I live pretty near a quarter of a mile from the depot, I suppose. There are some residences (between) my planing mill and the depot, there are four. Around my planing mill there is a pretty thickly settled neighborhood. It is mostly colored people."

And as to its use: "About that time (the time of the alleged injury) and subsequent to that time I would say that the road there where that crossing leads across has been used by the public generally. A good many people who have no connection with my mill, or business with the railroad, are passing going to and fro across that crossing; some do. * * * In my best judgment the average number of different cars and different trucks passed there 200 times on an average day, backwards and forwards. We had about fifteen trucks hauling lumber for us at that time. Outside of the lumber trucks about 10 or 12 pass there a day. * * * I say there were about 15 trucks hauling lumber there. They made on an average of about four trips a day. In other words, each truck would pass there over that track eight times a day going and coming, and we had fifteen trucks. That was all that we had. Those trucks were not running every day. As to how many days during a month they would run that strong, well, along at that time it was very dry weather and the roads were good, and they were running practically five or six days in the week hauling lumber. Trucks other than those lumber trucks and people passing beyond my mill and going into Midway, or coming out of Midway and points north of that railroad were coming by there; they passed there. They were going to other points north or south."

There was also evidence going to show that the employees of the mill, and other persons in automobiles, passed over this crossing daily.

The evidence was without dispute that the enginemen in charge of the locomotive on this occasion passed this point daily, had engaged in switching on the spur track leading up to the mill, and were familiar with the existence and location of the crossing, and tend-

ed to show that they were familiar with the character of its use. The railroad tracks on which the train was operated approached the crossing on a curve, and the engineer testified he could not see the north rail as the train approached, when he was within 50 feet of the crossing. While the evidence shows that the enginemen were keeping a lookout, and that the fireman discovered the plaintiff's automobile as it entered upon the crossing, and signaled the engineer to stop, when the locomotive was within 50 feet of the crossing, there was evidence going to show that the train was then running at the rate of from 20 to 35 miles per hour, without signals of approach, and that it was then impossible to stop the train or check its speed so as to avert the injury.

■ It is a well-settled doctrine that it is wanton conduct "to run a train at a high rate of speed, and without signals of approach, at a point where the trainmen have reason to believe there are persons in exposed positions on the track, as over an unguarded crossing in a populous district of a city, or where the public are wont to pass on the track with such frequency and in such numbers, facts known to those in charge of the train, as that they will be held to a knowledge of the probable consequences of maintaining great speed without warnings, so as to impute to them reckless indifference in respect thereto, would render their employer liable for injuries resulting therefrom, notwithstanding there was negligence on the part of those injured, and no fault on the part of the servants after seeing the danger." Georgia Pacific Railway Co. v. Lee, 92 Ala. 271, 9 So. 230, 234; Nave v. Ala. Great Southern R. R. Co., 96 Ala. 264, 11 So. 391; Haley v. Kansas City, Memphis & R. R. Co., 113 Ala. 640, 21 So. 357; Highland Avenue & Belt R. R. Co. v. Robbins, 124 Ala. 113, 27 So. 422, 82 Am. St. Rep. 153; Louisville & N. R. Co. v. Heidtmueller, 206 Ala. 29, 89 So. 191; Alabama Great Southern Ry. Co. v. Guest, as Adm'r, 144 Ala. 373, 39 So. 654.

■ In the light of this doctrine, the evidence presented a case for jury decision under the counts charging wanton injury, and special charges 2, 3, 4, 9, 10, 11, 12, 13, 16, 17, 18, 19, 20, 24, 25, 26, and 27 were refused without error. Louisville & Nashville R. R. Co. v. Loyd, 186 Ala. 119, 62 So. 153.

■ The appellant's contention that it was entitled to the affirmative charge because of a variance, "which could have been cured by amendment of the pleadings," is without merit, it not appearing that from the record the variance was brought to the attention of the trial court by objection to the evidence. Rule 34, Circuit Court Practice; Bickley, McClure & Co. v. Porter et al., 193 Ala. 607, 69 So. 565; Ruffin Coal & Transfer Co. v. Rich, 214 Ala. 633, 108 So. 596; Carter et al. v. Shugarman, 197 Ala. 577, 73 So. 119.

The appellant's contention is that it was due the affirmative charge as to count one, because of plaintiff's negligence in failing to stop, look, and listen.

The evidence shows that the road approached the railroad tracks from the north, the direction from which plaintiff was traveling, up a sharp incline, passing over the spur track leading up to the planing mill; that the road leading to the crossing immediately before it reached the spur track passed through a heavy sand bed, requiring the plaintiff to drive with considerable speed to pass over the incline; that the spur track was considerably higher than the main line on which the train approached, from 2½ to 3 feet, making a sharp incline leading down to the main line, which, according to the judgment of some of the witnesses, was from 15 to 35 feet from the spur track, though one witness testified that he measured the distance and that it was 39 feet and 9 inches. As before stated, the evidence shows that the railroad tracks approached the crossing on a curve, and there was evidence going to show that the view of the tracks from which the train approached was obstructed by a box car on the spur track, and a lumber pile, and that plaintiff did not have a clear view of the track until he passed the box car, when he could see up the track for several hundred feet.

A few minutes before the collision the plaintiff, who had business with Abrams, the mill foreman, went to his automobile then standing near the mill office, cranked the car, and plaintiff and Abrams got in the car, and plaintiff, without stopping to look and listen, drove the car onto the crossing, where the collision occurred. Plaintiff testified that he looked and listened for trains just before he got in the car.

The evidence as to the speed of the automobile when it went on the crossing was conflicting; some of the evidence tended to show that it was moving from 4 to 5 miles per hour, and some that it was moving 15 miles per hour.

There was also evidence to the effect that if the car was moving 4 or 5 miles per hour it could have been stopped after it passed the box car, where the view was clear, before going onto the main line on which the train was approaching. While there were other phases of the evidence tending to show that it was necessary for the plaintiff to speed up the car to make the grade over the spur track, and when he reached a point where he could see, if the car was running 15 miles per hour, it could not have been stopped before reaching the main line.

■ That it was the duty of the plaintiff as the automobile approached the crossing, and before he attempted to cross over the tracks, to stop, look, and listen, and that this duty

should have been performed at such time and place, with reference to the particular crossing, as would have enabled him to discover the approach of the train, either by sight or sound, are propositions too well settled to permit of further controversy.

Speaking of this duty in Central of Ga. Ry. Co. v. Barnett, 151 Ala. 410, 44 So. 392, 394, it was said: "He must stop so near to the track, and his survey by sight and sound must so immediately precede his effort to cross over it, as to preclude the injection of an element of danger from approaching trains into the situation between the time he stopped, looked, and listened and his attempt to proceed across the track. If he stops so far from the railway as that a train which could not be seen from that point could and does reach the crossing by the time he has traversed the intervening distance and gotten on the track, he negligently contributes to the resulting collision and injury," proximately resulting from simple initial negligence, and for such injury so caused he cannot recover. Atlantic Coast Line R. Co. v. Jones, 202 Ala. 222, 80 So. 44.

The foundation of this salutary doctrine is the right and duty of railroad companies to operate their trains to meet the demands of commerce, the relative inconvenience to the railroad company and the traveler seeking to cross in stopping, and the known danger incident to crossing over railroad tracks, of which the railroad tracks are a warning. The evidence is clear to the conclusion that there was no negligence on the part of the defendant's servants after the discovery of the peril, and, if this doctrine had been asserted by the pleadings in its full force and vigor, we would, without hesitation, hold that the plaintiff in this case was guilty of negligence which proximately contributed to his injury, in that he failed to stop, look, and listen before attempting to cross.

■■ There is another well-settled principle of law, however, applicable to the case as presented here, that must be taken into account. That is, contributory negligence is a special affirmative defense that must, in the absence of a waiver of special pleading, be pleaded with particularity, and no other acts of negligence than those specially pleaded can be proved on the trial of the case, and, if proved, they cannot be made a predicate for a verdict for the defendant. Southern Ry. Co. v. Shelton, 136 Ala. 191, 34 So. 194.

■ As we have heretofore stated, both of defendant's special pleas aver that after the plaintiff had reached a point where he had a clear view up and down the railroad tracks, and if he had stopped, looked, and listened, could have "seen and heard the approaching train," and by failing to do so was guilty of negligence which proximately contributed to his injury. On the issues thus presented, the evidence was in conflict, some of it tending to show that, when plaintiff reached the point where he had a view of the railroad track, it was not possible for him to stop and look and listen, presenting a question for the jury, and necessitating the refusal of charge 1—the affirmative charge as to count one of the complaint.

■■ In the oral charge, the court treated the crossing in question as a private road crossing, and instructed the jury that no duty rested upon the defendant to give the statutory signals required for public road crossings; but, inasmuch as the injury occurred while the train was passing through the town of Midway and within its corporate limits, it was the duty of the defendant's servants in charge of the locomotive to blow the whistle or ring the bell at short intervals while moving within or passing through the town of Midway, and a failure to comply with the statute in this respect was negligence. Code of 1928, § 9952; Walker v. Ala., Tenn. & Northern Rwy. Co., 194 Ala. 360, 70 So. 125; Western Ry. of Ala. v. Madison, 16 Ala. App. 588, 80 So. 162; Elliott on Railroads (3d Ed.) § 1647. No injury resulted to appellant from the refusal of charges 22 and 23.

The fact above noted—that the injury occurred while the train was passing through a town—is sufficient to differentiate this case from Atlantic Coast Line R. Co. v. Carter, 214 Ala. 252, 107 So. 218.

We find no reversible errors on the record. Affirmed.

ANDERSON, C. J., and SAYRE and THOMAS, JJ., concur.